[Cite as *Evans v. Wyler*, 2018-Ohio-1726.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| JAMES E. EVANS | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO.: 2017-CA-77 |
| | : | |
| v. | : | T.C. NO. 16-CV-615 |
| | : | |
| JEFF WYLER CHRYSLER JEEP | : | (Civil Appeal from |
| DODGE RAM OF SPRINGFIELD | : | Common Pleas Court) |
| | : | |
| Defendant-Appellee | : | |

. . . . . . . . . . .

# **O P I N I O N**

Rendered on the 4th day of May, 2018.

. . . . . . . . . . .

KENNETH IGNOZZI, Atty. Reg. No. 55431, 131 N. Ludlow Street, Suite 1400, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellant


JONATHAN PHILLIP, Atty. Reg. No. 43705, 6 PPG Place, Suite 870, Pittsburgh, Pennsylvania 15222
        Attorney for Defendant-Appellee

. . . . . . . . . . . . .

DONOVAN, J.

        **{¶ 1}** This matter is before the Court on the September 6, 2017 Notice of Appeal of James E. Evans. Evans appeals from the August 11, 2017 decision of the trial court

granting summary judgment in favor of Jeff Wyler Chrysler Jeep Dodge Ram of Springfield ("Wyler") on Evans' complaint for personal injuries. We hereby affirm the judgment of the trial court.

{¶ 2} Evans filed his complaint on September 12, 2016. The complaint alleges that on November 17, 2014, Evans, "a business invitee at Jeff Wyler Springfield * * * was injured as a result of a slip and fall, the proximate cause of which was a dangerous and hazardous condition caused by and known by Defendant Jeff Wyler Springfield, to exist." According to the complaint, an "unnatural accumulation of ice on the pavement area in front of a service entrance from an improperly placed drainage system and/or inadequately maintained cement surface" existed at Wyler. The complaint alleges that Wyler was negligent in that it failed to keep the premises free from the dangerous condition, and that Wyler was aware of the dangerous condition. The complaint further alleged that Wyler "was negligent in the maintenance and care of its premises in that it failed to properly design, construct, and/or erect caution signs or otherwise warn the public generally, and Plaintiff, James E. Evans, specifically, of hazardous conditions resulting from their inadequate maintenance activities." Evans sought medical expenses in the amount of $175,000.00 and lost wages in the amount of $104,000.00.

{¶ 3} Wyler answered the complaint on October 16, 2016. On June 14, 2017, Wyler filed a motion for leave to file a motion for summary judgment, and on June 29, 2017, Wyler filed a motion for summary judgment. The motion provides that "a landowner owes no duty to protect its guests" from accumulations of ice. According to Wyler, "the condition on which Plaintiff slipped was a natural accumulation of ice," and Wyler "owed Plaintiff no duty with regard to that condition. And without duty, there can

be no negligence."

**{¶ 4}** The motion provides that Evans arrived at Wyler, located at 1501 Hillcrest Avenue, on the evening of November 17, 2014 to leave his cruiser for service. According to Wyler, it "was very cold that evening and had snowed either earlier that day or the previous day. Plaintiff exited his vehicle and deposited his keys in the after-hours location and, as he was walking to where his wife was parked, Plaintiff slipped and fell on a patch of ice on the concrete surface." Wyler asserted that an "accumulation of ice is natural if it was caused by natural conditions, such as inclement weather, low temperatures, and wind. An accumulation of ice is unnatural if it is man-made."

**{¶ 5}** Wyler argued as follows (footnotes omitted):

       * * *

Moreover, courts have routinely applied the above rule to preclude liability against a landowner for falls occurring on ice, even black ice. Courts have also held that the presence of ice or snow is not unnatural merely because ice previously melted and refroze on the premises, because the property owner took steps to remediate the ice but missed certain spots, or because ice resulted from runoff of piled snow. And the absence of ice in surrounding areas does not make the presence of ice on specific premises unnatural. And finally, the fact that plaintiff slipped on ice near a grate does not give rise to the conclusion that the patch was melted run off that re-froze.

Here, Plaintiff likely will attempt to raise two arguments in opposition to this motion. First, [P]laintiff will claim the patch of ice was near a sewer

grate to support a claim the ice melted and re-froze in an unnatural way. Second, he will argue that a Wyler employee knew it was icy in the parking lot and failed to take adequate measures to protect plaintiff. Neither argument is sufficient to withstand the scrutiny of a summary judgment burden.

Plaintiff's claim that the ice was "unnatural" since it melted and re-froze near a sewer basin finds no support in law. Initially, both parties agree that it was exceptionally cold at the time of the subject incident and that it had snowed within a day of Plaintiff's fall. It is therefore fairly presumed that the ice on which Plaintiff slipped was naturally occurring and the result of inclement weather conditions. And, the Second District has held, on facts similar to the case at bar, that re-freezing of runoff water does not make the natural ice, somehow unnatural. Indeed, it is well settled law that an accumulation of ice does not become unnatural simply by virtue of water collecting in a depression in a sidewalk and subsequently freezing.

* * *

Second, as above, the mere fact that Wyler knew the parking lot in general was icy did not give it greater knowledge of the claimed hazard. It was well below freezing at the time of the incident and all people in Ohio are on notice of the potential of icy conditions. Also, there is no evidence that Wyler had any greater awareness of the specific patch of ice than [P]laintiff would have had if he simply watched where he was walking.

* * *

{¶ 6} Attached to the motion for summary judgment is a copy of Evans' complaint, and portions of the depositions of James Evans and Austin J. Castle, a sales manager at Wyler.

{¶ 7} On July 13, 2017, Evans responded to the motion for summary judgment. Evans asserted that Wyler's claim that the "hazard" was a natural accumulation of ice is "contradicted by the evidence." Evans asserted that after completing his shift as a Clark County Sheriff's Deputy on November 17, 2014, he proceeded to Wyler to drop off his cruiser for repair of the fuel gauge. Evans asserted that he was instructed to drop off the cruiser near the service area and to deposit the keys into a locked box. He asserted that his wife and son arrived behind him to pick him up.

{¶ 8} Evans asserted as follows:

* * * Evans parked approximately 50 feet to the right of the service door and walked up to the box to drop off his key. * * * Evans' wife had parked in front of the service center doors, parallel to the building. * * * There was no snow on the grounds of Defendant Wyler nor did Evans see any ice anywhere on the premises. * * * After dropping the key in the box, Evans walked toward his wife's car. * * * As he walked, he could see the pavement in front of him and did not see any ice on it. * * * However, when Evans stepped on the pavement near a sewer drain in Defendant Wyler's parking lot, his feet slipped out from under him and he fell. * * * As a result of the fall, Evans suffered fractured ribs and a badly fractured left arm.

Evans' wife and son ran to Evans' side and called 911. * * * Evans' wife knocked on the doors of the dealership until some employees came

out to help. * * * While they waited on the ambulance, Defendant Wyler's sales manager asked Evans' wife to come in and exchange information. * * * Defendant Wyler's sales manager told Evans' wife that "we were just saying that we needed to resalt this area."

{¶ 9} Evans asserted that Wyler had a duty to remove or warn of the ice that caused his fall because Wyler was aware of the ice and it was not naturally occurring. Evans asserted that "there was no ice or snow, not only on the roadways but anywhere else on Defendant Wyler's parking lot other than this small patch." He asserted that "no snow or ice was visible on Defendant Wyler's parking lot on November 17, 2014," and he directed the court's attention to his deposition, as well as the depositions of his wife and son.

{¶ 10} Evans asserted as follows:

While there is some evidence it had snowed the previous day, on the day of Evans' fall there was no precipitation. * * * Defendant Wyler's snow and ice removal personnel did not have to remove any snow or ice on November 17, 2014. * * * Snow was not piled up in any portion of the parking lot. * * * Nowhere else Evans had been that day had any ice on the ground. * * * Moreover, the weather during the daylight hours on the day that Evans' [sic] fell was warmer, with neither Evans nor his wife needing jackets when they went outside. * * * Only after the sun set on November 17th did the weather become colder. * * * With this warmer weather and minimal precipitation, there were no piles of snow or ice in Defendant Wyler's parking lot from which water could run off and later refreeze.

{¶ 11} Evans asserted that the parking lot "was free from snow and ice except for the depressed area immediately surrounding the sewer drain. The ice around this drain did not naturally *accumulate* in this area. There were no snow piles or run off trails from collected ice or snow from which water was draining to this location." Evans asserted that Exhibits A, B, and C to the deposition of his son, Kaleb Evans, which are photographs of the area, demonstrate that the "parking lot contained this drainage pipe[1] in the pavement and that the area immediately surrounding this drain was depressed and/or collected precipitation, thus failing to properly drain water into the pipe. The improper drainage allowed water and ice to unnaturally accumulate on the pavement around this drain * * *." Finally, Evans asserted that "the black ice was not observable under the circumstances and did not accumulate in this spot naturally."

{¶ 12} In reply, Wyler asserted that Evans' assertion that the weather was warm and there was little precipitation on the day of his fall "is not legally sufficient to withstand Rule 56 scrutiny, as the allegedly contested facts do not raise a 'genuine' issue." Wyler argued that "official weather data from November 17, 2014, indicates that was simply not the case. In fact, the highest temperature recorded that day was 33 degrees, barely above freezing, and that temperature persisted for less than an hour. Indeed, for the entirety of the day, aside from that period, the temperature remained below freezing." Further, Wyler asserted, there "were also scattered incidents of snowfall throughout the morning of Plaintiff's fall."

{¶ 13} Attached to Wyler's reply brief as Exhibit D, in support of the above

---

[1] We note that in none of the photographs of the area is a "drainage pipe" depicted. A large grate in the asphalt in the area of Evans' fall is visible. Furthermore, there is no testimony that some kind of elevated pipe runs to the drain.

statements regarding the weather, is an 11 page printout from an internet website, entitled, "Weather History for Springfield, OH/ Weather Underground," reflecting, inter alia, the hourly temperatures and precipitation in Springfield on November 17, 2014. Wyler asserted that it "remains clear that the condition on which Plaintiff slipped was a natural accumulation of ice." Wyler asked the trial court "to take judicial notice of the weather conditions throughout the day and at the location of Plaintiff's incident." According to Wyler, the "weather data relevant to this matter is explained by the Weather History, which was obtained through Weather Underground's website * * *. Taking judicial notice of weather is entirely proper." Wyler argued that "courts have also relied on weather data coming from Weather Underground's website in ascertaining weather conditions or taking judicial notice." Wyler asserted that specifically, the trial court "should notice the fact that for almost the entire day, the temperature was at or below freezing, and the fact that it had snowed the morning of Plaintiff's incident."

{¶ 14} Wyler further argued that Evans failed to show that Wyler owed him a duty. Wyler argued that Evans' "subjective assessment of the weather carries no weight. The objective record of the weather and precipitation of the day of [the] subject incident * * * reveals that for almost the entire day it was at or below freezing and that it had snowed sporadically during the morning." Wyler asserted that Evans' "speculative recollection of the weather bears no resemblance to objective fact. Speculation and conjecture, which is all that Plaintiff's assertions amount to, cannot raise an issue of fact to oppose summary judgment."

{¶ 15} Wyler asserted that this "case does not involve a defective condition on the premises or any part of Jeff Wyler's premises being in disrepair or somehow otherwise

causing water to pool and freeze. Even if Plaintiff were attempting to assert such a theory, he has offered no expert or other evidence to support any contention that the drain on the property was dangerous or defective." Wyler asserted that the mere existence in the parking lot of a depressed area containing a drain, "as a matter of law, is not a sufficient basis to establish liability." Wyler argued that, "[i]n other words, the mere presence of pooling water at a drain at a lower elevation is not enough to make an accumulation of ice unnatural absent evidence that the premises were in a defective condition. In order to support such an assertion, Plaintiff must necessarily produce evidence that the premises were unreasonably dangerous." Finally, Wyler asserted that the "weather was cold enough through the day that any thawing (if indeed there was any at all) would refreeze on the premises. The Court must therefore presume that the ice on which Plaintiff slipped was naturally occurring. Plaintiff bears the burden of producing evidence that raises a question of fact to the contrary. He failed to do so."

{¶ 16} On August 11, 2017, at 10:55 a.m., Evans filed "Plaintiff's Motion to Strike" Exhibit D to Wyler's reply, asserting that the Exhibit is not competent summary judgment evidence pursuant to Civ.R. 56. Evans asserted that Exhibit D "is hearsay and not properly authenticated * * *. Weather Underground is a commercial private entity, not a governmental body, and it is unclear where it obtains its data. Likewise, Exhibit D does not demonstrate who recorded this data in its printouts, * * * or how it was obtained." Evans asserted that "Exhibit D is neither a certified copy of a document nor is it attached to an affidavit containing the proper authentication." Finally, Evans asserted that "because Exhibit D is not permissible evidence, this Court should not take judicial notice of a fact alleged in this improper evidence."

**{¶ 17}** Evans' motion to strike was not ruled upon.   In fact, just 27 minutes later Wyler's motion for summary judgment was granted.   In granting Wyler's motion, at 11:22 a.m. on August 11, 2017, the trial court determined as follows:

Upon a review of the pleadings, motions, memoranda, and arguments of counsel, the Court adopts the reasoning set out in defendant's memorandum and finds Jeff Wyler is not liable to Mr. Evans for his alleged injuries from this slip and fall incident.   Plaintiff has offered nothing beyond speculation that he fell on anything other than a natural accumulation of ice. Mr. Evans cannot demonstrate that Jeff Wyler created an unnatural condition maintaining their premises simply by claiming that a patch of ice melting and re-freezing near a sewer basin created an unnatural accumulation, re-freezing of runoff water does not make the natural ice somehow unnatural simply by virtue of water collecting in a depression in a sidewalk and subsequently freezing.

Further, even if Mr. Evans somehow could demonstrate that he fell on an unnatural accumulation, Mr. Evans should have been aware of the potential for ice in the parking lot, it was well below freezing at the time of the incident.   The Court takes judicial notice of the weather conditions throughout the day and at the locations of plaintiff's incident.   A pedestrian, who is walking has a duty to use care reasonably proportioned to the danger likely to be encountered. It was exceptionally cold, the temperature was at or below freezing most of the day and it had snowed the morning of his fall, it is therefore fairly reasonable to conclude that people using the parking lot

would be on notice of the potential icy conditions.

The mere fact that defendant knew the parking lot in general was icy gave defendant no greater awareness of the specific patch of ice than plaintiff would have, had he simply watched where he was walking.

Snow and ice are a part of wintertime life in Ohio. It is well-established in Ohio that the dangers from natural accumulation of ice and snow are obvious enough that any landowner may reasonably expect individuals on the premises to appreciate the risks associated with natural accumulation of ice and snow and to protect themselves against such conditions. Therefore, an owner or occupier has no duty, even to a business invitee, to remove natural accumulations of ice or snow. Therefore, Jeff Wyler owed plaintiff no duty and plaintiff cannot hold Jeff Wyler liable for his injuries. No genuine issue of fact remains and reasonable minds can come to but one conclusion and that is Jeff Wyler is entitled to judgment in its favor as a matter of law.

Plaintiff's claims are DISMISSED.

{¶ 18} Evans asserts two assignments of error herein. His first assignment of error is as follows:

THE TRIAL COURT IMPROPERLY TOOK JUDICIAL NOTICE OF THE WEATHER CONDITIONS ON THE DATE OF EVANS' INJURY.

{¶ 19} Evans asserts that Wyler "improperly raised a new argument in his reply brief, seeking for the trial court to take judicial notice of the temperatures on the date Evans' [sic] was injured. This was improper because Defendant Wyler did not raise the

judicial notice argument until its reply brief, denying plaintiff an opportunity to respond, and the evidence used to support the argument was not permissible evidence." According to Evans, Wyler's argument about the weather on November 17, 2014, "was not raised in Defendant Wyler's initial motion and amounted to summary judgment by ambush." Evans asserts that the "trial court erroneously took judicial notice and relied upon the notice to rule against Mr. Evans." Evans argues that Exhibit D "is neither a certified copy of a document nor is it attached to an affidavit containing the proper authentication."

{¶ 20} In response, Wyler notes that Evans did not "attempt to dispute the factual accuracy" of the data in Exhibit D, and Wyler asserts that Evans "clearly could not do so." According to Wyler, "the weather data here was neither new evidence nor hearsay." Wyler asserts that "judicial notice is *required* when the party requesting such notice supplies the court with the necessary information," pursuant to Evid.R. 201(D).

{¶ 21} Wyler asserts as follows:

In this case, Jeff Wyler was not offering new evidence with its Reply, but – as the Evidence Rules permit – was pointing the trial court's attention to information provided by a credible source, the accuracy of which information is beyond reasonable questioning. Specifically, the relevant weather data was obtained through Weather Underground, and was merely represented by the Weather History Jeff Wyler offered. Moreover, this request to take judicial notice was advanced only after Evans argued that the ice melted and re-froze due to warm weather in his opposition brief.

{¶ 22} In a footnote, Wyler asserts as follows regarding the source of the data in

Exhibit D:

> * * * Even a cursory review of [www.wunderground.com] reveals, however, that Weather Underground has been operating as a premier internet-based weather data service for nearly 25 years, and it get[s] its data from numerous sources, including and especially weather stations managed by the National Oceanic and Atmospheric Administration and the Federal Aviation Administration.

{¶ 23} Wyler directs our attention to multiple state and federal authorities, asserting that "Evans' argument that there was supposedly an 'ambush' with new evidence is disingenuous; weather data is publicly available information and equally accessible at all relevant times to Evans." Wyler argues that the Evidence Rules permitted him to seek judicial notice of Exhibit D, and that once he did so, "the Evidence Rules required the court to take judicial notice of it."

{¶ 24} In reply, Evans critiques Wyler's assertion "that when a party seeks for a court to take judicial notice of an adjudicative fact for a pending motion for summary judgment, it does not need to follow the standard Civil Rule 56 rules, such as presenting the evidence prior to the reply or hearsay." Evans asserts "this is inaccurate." Evans argues that evidence "may not be presented for the first time in a reply in support of a motion for summary judgment." Evans in a footnote asserts that Wyler "attempts to gloss over the fact that Exhibit D, containing the weather underground printouts, was not presented to the trial court prior to being attached to its Reply." Evans asserts that Wyler attempts to do so "by pointing to Rule of Evidence 201(F) stating that judicial notice may be taken at any stage." According to Evans, Wyler "is arguing summary judgment by

ambush is permissible if judicial notice is the vehicle used in the reply in support of the summary judgment motion." Evans asserts that Wyler ignores Evid.R. 201(E), which provides an opportunity to be heard as to the propriety of judicial notice.

{¶ 25} Evans argues that "regardless of whether the evidence should have been stricken for the timing of when it was raised, it should have been stricken as improper summary judgment evidence." Evans asserts that "before a court may take judicial notice of information contained in a website document it must meet an exception to [the] hearsay rule." Evans maintains that Wyler failed to incorporate Exhibit D into an affidavit as required by Civ.R. 56, and that instead, "the printouts contain no information stating the website where it was printed from except for a partial website at the bottom of the pages and the heading 'Weather History for Springfield, OH/Weather Underground.' This printout does not allow for ready determination of the data from a source whose accuracy cannot be questioned." Evans notes that Wyler "even concedes weather underground gets its data from 'numerous sources.' " Evans notes that the "website itself states its data partially comes from 'personal weather stations' and a 'passionate community of weather enthusiast that share weather data and content across our products. With 250,000+ of our members sending real-time data from their own personal weather stations.' " According to Evans, "the data provided is influenced by these unnamed enthusiasts with their personal stations. In contrast, the National Weather Service has a procedure for ordering certified past weather data for use in litigation."

{¶ 26} Evid. R. 201 governs "judicial notice of adjudicative facts; i.e., the facts of the case." Evid. R. 201(A). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction

of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B). Evid.R. 201(D) provides that a "court shall take judicial notice if requested by a party and supplied with the necessary information." Evid.R. 201(E) provides that "a party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." Evid.R. 201(F) provides that judicial "notice may be taken at any stage of the proceeding."

{¶ 27} We agree with Evans that the trial court erred in judicially noticing Exhibit D for two reasons. First, as this Court has previously noted:

> * * * [A] party "is barred from raising new arguments and offering evidence for the first time on reply," *In re Fuel Adjustment Clauses for Columbus S. Power Co. & Ohio Power Co.,* 140 Ohio St.3d 352, 2014–Ohio–3764, 18 N.E.3d 1157, ¶ 37. "The danger * * * is that the opposing party does not have an opportunity to respond and may be subjected to summary judgment by ambush." (Citations omitted.) *Baker v. Coast to Coast Manpower, L.L.C.,* 3d Dist. Hancock No. 5–11–36, 2012–Ohio–2840, ¶ 35. *See also Ohio Receivables, L.L.C. v. Williams,* 2d Dist. Montgomery No. 25427, 2013–Ohio–960, ¶ 25, fn. 3 (saying that "Civ.R. 56 does not permit a party to obtain summary judgment 'by ambush' "). So if a new argument is raised or new evidence is offered in a reply, "the proper procedure is to strike the reply * * * or, alternatively, to allow the opposing party to file a surreply." (Citations omitted.) *Baker* at ¶ 35. *See also Charlesgate Commons Condominium Assn. v. W. Res. Group,* 6th

Dist. Lucas No. L–14–1039, 2014–Ohio–4342, ¶ 13 (saying that "when a new argument is presented in a reply brief, the non-moving party should move to strike the reply or be allowed to file a surreply"); *Smith v. Ray Esser & Sons, Inc.,* 9th Dist. Lorain No. 10CA009798, 2011–Ohio–1529, ¶ 15 (saying that "a court may properly strike a reply that raises new arguments, or it may allow time for respondents to file a surreply").

*Mfrs. Equip. Co. v. StarStone L.L.C.*, 2d Dist. Montgomery No. 26725, 2016-Ohio-3276, ¶ 14.

**{¶ 28}** Second, Civ.R. 56 defines competent evidence for summary judgment purposes. Civ.R. 56 (C) provides in part:

* * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor. * * *

**{¶ 29}** Civ.R. 56 (E) provides as follows:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit. * * *

**{¶ 30}** As this Court has noted:

* * * Civ.R. 56(C) contains a "limited list of material that may be considered when ruling upon a motion for summary judgment." (Citation omitted.) [*Buzzard v. Pub. Emp. Retirement Sys. of Ohio*, 139 Ohio App.3d 632, 636, 745 N.E.2d 442 (10th Dist. 2000)]. If a document is not of a type listed, "it may be introduced as proper evidentiary material if incorporated by reference in a properly framed affidavit." (Citations omitted.) *Id.* However, " '[t]he proper procedure for introducing evidentiary matter not specifically authorized by Civ.R. 56(C) is to incorporate it by reference in a properly framed affidavit pursuant to Civ.R. 56(E).' " *Id.,* quoting *Biskupich v. Westbay Manor Nursing Home,* 33 Ohio App.3d 220, 222, 515 N.E.2d 632 (8th Dist.1986). *Accord CitiMortgage, Inc. v. Guinther,* 10th Dist. Franklin No. 12AP–654, 2013–Ohio–4014, ¶ 22; *Reeser v. Weaver Bros., Inc.,* 2d Dist. Darke No. 1359, 1995 WL 386849, *5 (May 1, 1995).

*Winkle v. Co*, 2d Dist. Montgomery No. 27066, 2016-Ohio-6957, ¶ 34.

**{¶ 31}** Exhibit D was not subject to judicial notice at Wyler's request because

new evidence is barred in a reply absent an opportunity to file a surreply. Furthermore, the proper remedy was to strike Exhibit D, since it also contained incompetent, unauthenticated summary judgment evidence.

{¶ 32} However, our analysis of Evans' first assignment does not end our inquiry into the propriety of summary judgment in Wyler's favor. In the course of our de novo review, we must further consider if a genuine issue of material fact exists as to whether Evans fell on an unnatural accumulation of ice, as discussed in Evans' remaining assignment of error. Because we conclude, as set forth below, that there is no genuine issue of material fact in this regard, the trial court's error in taking judicial notice of weather conditions on the date of Evans' injury is harmless. Accordingly, the first assignment of error is overruled.

{¶ 33} Evans' second assignment of error is a follows:

THE TRIAL COURT ERRED IN GRANTING DEFENDANT WYLER

SUMMARY JUDGMENT BECAUSE AN ISSUE OF FACT EXISTS AS TO

WHETHER DEFENDANT WYLER HAD A DUTY TO REMOVE OR WARN

OF THE HAZARD THAT CAUSED EVANS' FALL.

{¶ 34} Evans argues that "an issue of material fact exists as to whether the ice accumulated in this particular spot naturally, and summary judgment for Defendant Wyler should be reversed." Evans argues that "where a landowner negligently fails to remove an unnatural accumulation of ice, he is liable for injuries that result from allowing the unnatural accumulation to exist." He argues that a "natural accumulation is created by an act of nature," and that "an unnatural accumulation is one that is created or caused by an act of a person."

{¶ 35} Evans further directs our attention to *Tyrrell v. Investment Assocs., Inc.,* 16 Ohio App.3d 47, 474 N.E.2d 621 (8th Dist.1984), and *Rayburn v. City of Columbus*, 10th Dist. Franklin No. 98AP-1024, 1999 WL 394810 (June 17, 1999). He argues that in "this case, no snow or ice was visible on Defendant Wyler's parking lot on November 17, 2014," directing our attention to the depositions of his family. Evans asserts as follows:

> * * * Evans presented evidence that while there was some evidence it had snowed the previous day, on the day of Evans' fall there was no precipitation. * * * This was also supported by the fact that Defendant Wyler's snow and ice removal personnel did not have to remove any snow or ice on November 17, 2014. * * * Further, the evidence showed snow was not piled up in any portion of the parking lot. * * * Nowhere else Evans had been that day had any ice on the ground. * * * Moreover, the weather during the daylight hours on the day that Evans' [sic] fell was warmer, with neither Evans nor his wife needing jackets when they went outside. * * * Only after the sun set on November 17th did the weather become colder. * * * With this warmer weather and minimal precipitation, there were no piles of snow or ice in Defendant Wyler's parking lot from which water could run off and later freeze.

{¶ 36} Evans argues that the trial court "disregarded this evidence" and "failed to view this evidence in a light most favorable to Evans." He argues that if "it had snowed the morning of Evans' fall and the temperatures been at or below freezing, then Defendant Wyler's snow and ice removal personnel would have had to remove some snow or ice from the lot or snow and ice would have still been all over the parking lot." He argues

that the evidence established that Wyler did not have to remove snow or ice from the parking lot on the day that he fell.

**{¶ 37}** Evans argues that the ice in the area around the sewer drain did not naturally accumulate there, and that "this drain was depressed and/or collected precipitation, thus failing to properly drain water into the pipe." According to Evans, "the improper drainage allowed water and ice to unnaturally accumulate on the pavement around this drain, similar to the black ice forming in the depressions in *Rayburn* and the ice forming on the sidewalk in *Tyrrell*."

**{¶ 38}** Evans asserts that Wyler's "employees knew the area around the drain was icy and was a hazard," and that despite "this knowledge and access to salt * * * Defendant Wyler's employees failed to remove the black ice hazard." Finally, Evans argues that "the ice accumulation around the drain on Defendant Wyler's property was substantially more dangerous tha[n] Evans' [sic] would have had reason to anticipate, considering that no snow or ice was visible on Defendant Wyler's premises, there was no precipitation that day, and nowhere else Evans had been on that day had any ice on the ground."

**{¶ 39}** Wyler responds that "Ohio law is clear that a premises owner owes no duty to protect invitees against naturally occurring snow or ice," and "[t]his rule applied equally to unseen, or 'black' ice." According to Wyler, an "accumulation of ice is natural if it was caused by natural conditions, such as inclement weather, low temperatures, or wind," and unnatural if man-made. Wyler argues that "the presence of ice is not unnatural merely because ice previously melted and refroze, because the property owner took incomplete steps to remediate the ice, or because ice refroze from runoff of piled snow."

**{¶ 40}** Wyler asserts as follows:

But even were the trial court or this Court not to consider the weather data, the fact remains that Evans' only basis for the assertion that the ice was not a naturally occurring accumulation is his own speculation and conjecture that the drain in the general vicinity somehow caused the ice to unnaturally pool. He has not, for example, produced any evidence that the drain was defective or clogged. Evans merely guesses that some problem with the drain was responsible for causing ice to unnaturally accumulate because the ice he encountered was near the drain. But as is also well-established in Ohio, speculation and conjecture cannot serve to raise an issue of fact * * *.

{¶ 41} Wyler argues that the "instant case does not involve a defective condition on the premises, and no part of Jeff Wyler's premises was in disrepair or somehow otherwise causing water to pool and freeze." Wyler asserts that Evans "offered no expert or other evidence in his summary judgment response to support any contention that the drain on the property was dangerous or defective." According to Wyler, in "both *Rayburn and Tyrrell*, the defective condition of the property was the cause of the accumulation of ice. That is certainly not the situation here." Wyler asserts that Evans did not "offer evidence suggesting that Jeff Wyler employees knew that the drain would routinely cause water to pool and freeze. All that Evans has offered is evidence that there was a depressed area containing a drain. But that fact alone, as a matter of law, is not a sufficient basis to establish liability." Wyler argues that "runoff from a higher elevation on the property to a lower one does not make the accumulation and freeze unnatural." Wyler argues that "it snowed either the day before or the day of Evans's accident. And

the weather was cold enough through the day such that any thawing would refreeze on the premises."

{¶ 42} In reply, Evans asserts that "an issue of material fact exists as to whether the drain at issue was defective and as such allowed ice to collect around it when it was absent from all other locations on Defendant Wyler's property. In this case, Defendant Wyler's parking lot was completely free of snow and ice other than the area around the drain where Evans' [sic] fell." Evans argues that there was no precipitation on the day of his fall. He argues that only "the depressed area around this drain pipe in the parking lot had ice. This ice would not have **naturally** appeared in just this single location on Defendant Wyler's property and nowhere else." Evans argues that Wyler "had superior knowledge of this ice hazard around this drain." He argues that Wyler's employees had access to salt but "did not salt this known icy location or give any warnings of its dangerous condition." According to Evans, "an issue of fact exists as to whether the hazard that caused Evans' fall and injuries was due to a natural accumulation of ice."

{¶ 43} As this Court previously noted:

Summary judgment should be granted only if no genuine issue of material fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. Civ.R. 56; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46. An appellate court reviews summary judgments de novo, meaning that we review such judgments independently and without deference to the trial court's determinations. *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio

App.3d 579, 588, 641 N.E.2d 265.

Upon a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue of material fact exists for trial. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292-93, 662 N.E.2d 264. Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Id.;* Civ.R. 56(E). Rather, the burden then shifts to the non-moving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts which show that there is a genuine issue of material fact for trial. *Id.* Throughout, the evidence must be construed in favor of the non-moving party. *Id.*

"[I]n order to establish actionable negligence, one seeking recovery must show the existence of a duty, the breach of the duty, and injury resulting proximately therefrom." *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 285, 423 N.E.2d 467. The status of the person who enters upon the land of another defines the scope of legal duty that the owner owes the entrant. *Gladon v. Greater Cleveland Reg. Transit Auth.,* 75 Ohio St.3d 312, 315, 662 N.E.2d 287, 1996-Ohio-137.

*Murphy v. McDonald's Restaurants of Ohio, Inc.*, 2d Dist. Clark No. 2010 CA 4, 2010-Ohio-4761, ¶ 12-14.

{¶ 44} It is undisputed that Evans was a business invitee on Wyler's property. As this Court has further indicated:

* * * The owner or occupier of a business premises owes an invitee

whose presence serves the owner's business purposes a duty of ordinary care, and must maintain the business premises in a reasonably safe condition so that invitees are not unnecessarily and unreasonably exposed to danger. *Campbell v. Hughes Provision Co.* (1950), 153 Ohio St. 9, 90 N.E.2d 694. That duty requires the owner or occupier to either remove the hazard or, failing that, to warn the invitee of it to allow the invitee to protect himself from the danger to his safety the hazard presents. *Newton v. Pennsylvania Iron & Coal Co.* (1983), 85 Ohio App.3d 353, 619 N.E.2d 1081.

These duties the law imposes on the owner are subject to a further condition. When the invitee knows of the hazard or in the exercise of ordinary care should know of it, the invitee has a duty to protect himself from it. *Id.* Thus, a hazard that is open and obvious imposes no duty on the owner or operator of the premises to remove the hazard or warn the invitee of it. On that basis, it has been held that an owner or occupier has no duty to his business invitee to remove natural accumulations of snow and ice from his premises. *Sidle v. Humphrey* (1968), 13 Ohio St.2d 45, 233 N.E.2d 589, paragraph three of the syllabus. "This is because accumulations of ice and snow are so obvious that landowners may reasonably expect an invitee to discover them and take measures to protect himself against them." *Id.* at paragraph two of the syllabus.

"[S]ince the build-up of snow and ice during winter is regarded as a natural phenomenon, the law requires, at the very least, some evidence of

an intervening act by the [property owner] that perpetuates or aggravates the pre-existing, hazardous presence of ice and snow." *Porter v. Miller* (1983), 13 Ohio App.3d 93, 95, 468 N.E.2d 134. Therefore, "the threshold question in slip-and-fall cases involving ice or snow is whether the accumulation of ice is 'natural.' If it is natural, no duty exists to remove the accumulation or to render it less dangerous." *Community Ins. Co. v. McDonald's Restaurants of Ohio, Inc.* (December 11, 1998), Montgomery App. No. 2001 CA 17051. "Snow which melts and later refreezes into ice is considered a natural accumulation of ice caused by forces of nature." *Bionci v. Boardman Local Schools* (June 18, 2001), Mahoning App. No. 00 CA 6, 2001-Ohio-3197, at ¶ 19.

Conversely, a duty may arise to remedy an accumulation of ice or snow "if the accumulation was 'unnatural' or 'improper,' meaning that other circumstances exist that create a hazard 'substantially more dangerous to a business invitee than that normally associated with snow.' " *Community Ins., supra* (quoting *Mikula v. Tailors* (1970), 24 Ohio St.2d 48, 263 N.E.2d 316, paragraphs five and six of the syllabus). When the owner knows or should know that ice and snow have created a condition that is substantially more dangerous to an invitee than he could reasonably anticipate, the owner's failure to remove the ice and snow will constitute negligence. *Mikula, supra; Stinson v. Cleveland Clinic Found.* (1987), 37 Ohio App.3d 146, 524 N.E.2d 898.

A natural accumulation of ice or snow is one that accumulates as a

result of an act of nature. *Perazzo v. Dayton Hasty-Tasty, Inc.* (1962), 119 Ohio App. 453, 458, 200 N.E.2d 706. The term "unnatural accumulation" refers to causes and factors other than such inclement weather conditions as low temperature, strong winds and drifting snow. *Porter, supra.* Unnatural accumulations are man-made or man-caused. *Id.*

*Corson v. North American Truck Platform*, 2d Dist. Montgomery No. 19399, 2002-Ohio-6777, ¶ 8-12.

**{¶ 45}** In *Corson*, Rick Corson slipped and fell on ice on the parking lot of his employer, an automobile manufacturer, and the employer moved for summary judgment on Corson's claim for negligence in failing to clear the ice from the parking lot. *Id.*, ¶ 3-4. This Court found "no evidence supporting his allegation that the ice on which he fell was created by or aggravated by GM, or that it was anything other than a natural accumulation." *Id.*, ¶ 13. This Court noted the following facts and argument:

* * * Corson testified that he did not see any salt or sand on the ground or any mounds of snow that would indicate that the lot had been recently plowed. (Corson Depo. at 25, 31). Indeed, he testified that the ice looked as though it resulted from a natural accumulation of light rain or snow. (Corson Depo. at 27.)

Corson argues that the accumulation of ice and snow in the parking lot was not naturally occurring because he does not recall the roads he took from his house to the parking lot as being icy or hazardous, as compared to the parking lot. He deduces from this that because the roads were clear of ice and snow, any ice in the parking lot must therefore be unnatural. On that

basis, he argues that GM is necessarily liable because it failed to clear the snow and ice in its parking lot, or that a jury should determine whether that liability exists.

*Id.*, ¶13-14.

**{¶ 46}** This Court concluded in part as follows:

Even if the roads were clear, Corson is incorrect in his contention that because the roads were clear any snow and ice that had accumulated in the parking lot must be unnatural. The roads may have been in a different or better condition than the parking lot for any number of reasons. The roads may have been plowed or salted, and most likely were more heavily traveled than the parking lot. Simply because surrounding roads may have been clear in no way proves that the accumulation of snow and ice in the parking lot was unnatural. It shows only that whatever natural accumulation of snow and ice that may have been on the roads before Corson traveled them had been cleared or dissipated by traffic passing over them.

*Id.*, ¶15.

**{¶ 47}** We note that in his deposition, Evans testified that he has been employed as a deputy with the Clark County Sheriff's Office since 2006, and that in November of 2014, he worked the day shift from 7:00 a.m. to 3:00 p.m. Evans testified that on November 17, 2014, the weather was "[u]nusually warm for that day," but that it "got cold as the sun went down," dropping into the "30s." Evans stated that when his shift ended at 3:00 p.m., he went to the home of a friend for two hours, and then went home to pick up his cruiser "to drop it off that night at Wyler's to get it worked on, serviced," because

the "fuel gauge wasn't working." Evans stated that Wyler was expecting the cruiser, and he was advised to "park on the side where Meijer's was and the box was there where the service department is."

{¶ 48} Evans stated that he left home for Wyler "a little bit after 6:00," and that it is a 15 minute drive. He stated that he was wearing hiking boots with a rubber sole at the time. Evans stated that his wife and son planned to meet him there to drive him home. Evans stated that he parked in a marked parking space, approximately 50 feet from the key deposit box. Evans stated that he arrived "there maybe 6:15-ish, 6:30-ish," and that it was dark outside. When asked if there were any lights around the door to the service area, Evans responded, that it is "kind of dark where that spot is. It's not real well lit, but there was some lights on." Evans stated that the lights inside the service department were on, and he observed one or two people inside. He testified that his wife and son "pulled in and turned around and parked in front of the service center" with the passenger side of their vehicle closest to the building.

{¶ 49} Evans testified that he dropped off the key and turned around and "I start walking towards their car, I see my son get out of the passenger seat to get in the back seat and I slipped and fell." Evans identified Exhibit B as a black and white, nighttime photograph taken by his son of the area outside the service department, and he marked an "X" next to a large drain in the pavement to indicate where he fell. He also drew a "box" to indicate where his wife and son were parked, in the lower right hand corner of Exhibit B, parallel to the building and facing to the left. The large drain is visible between the service department and where Evans' wife and son were parked in the photograph. Evans stated that he parked to the right of the area depicted in Exhibit B in an area not

visible in the photo. Evans stated that the photo depicts what the lighting was like on the night of his fall.

{¶ 50} The following exchange occurred regarding Evans' fall:

Q. At any point as you're walking from your cruiser to the door to drop off the key, do you notice any ice on the driveway?

A. No.

Q. Do you look?

A. Yes.

Q. At any point between the time you dropped off the key - - about how many steps after you dropped off the key did you go before you slipped?

A. Maybe ten or fifteen.

Q. How close to the car were you when you slipped?

A. About halfway.

Q. Halfway between what and what?

A. Between where I started to the car.

* * *

Q. At any time between the time you were walking from the door to your car did you look down to see what the surface looked like?

A. Yes.

Q. And what did you notice?

A. Just black pavement.

Q. Did you notice any buildup of ice?

A.  No.

Q.  You didn't notice that there was ice all around where you slipped?

A.  No.

Q.  After you slipped and fell did you look around you?

A.  I'm sure I did.

Q.  Did you notice any ice after you slipped and fell?

A.  I didn't notice any ice until my feet was in the air.

Q.  * * *  Your feet are in the air, and then at that point you look down and you see ice?

A.  No, I didn't see any ice.

Q.  You told me you didn't notice any ice until your feet were in the air.

A.  When my feet went in the air, I realized that there must have been something, ice on the ground.

Q.  As you're walking to and from the car in this parking lot, did you ever consider there may be ice on the ground?

A.  No.

Q.  Had anywhere else you went that day had any ice on the ground?

A.  No.

Q.  Had there been any snowfall that day?

A.  No.

Q. Had there been any snowfall the day before?

A. Yes.

Q. Did you see any plowed snow in the driveway when you drove into Jeff Wyler?

A. No.

Q. Did you see any buildup of snow at all in the parking lot of Jeff Wyler?

A. No.

Q. * * * do you recall what leg slipped?

A. Both.   It was a shock to me.

* * *

{¶ 51} Evans stated that he did not have anything in his hands as he approached his wife's vehicle, that he was not speaking to his wife and son when he fell, and that when he fell his son was already in the backseat with the door closed.   When asked if he noticed any ice while on the ground waiting for the ambulance, Evans responded, "I felt ice on my butt, but I didn't - - I didn't feel to see if there was ice or, you know, * * *   I wasn't really concerned about it at that time."   When asked to describe the amount of ice he felt, Evans responded, "I have no idea how much ice there was," and "I know I was laying on it, but I don't know how big it was."   When asked if there was "ice all around you," Evans responded affirmatively.

{¶ 52} Carolyn Evans, Evans' wife, testified that she and her son, Kaleb, spent 45 minutes at the Planet Fitness across the street from Wyler before proceeding to the dealership to pick up Evans.   She stated that when she left the gym, it was "chillier.   As

far as raining or snowing, I don't believe it was at that time." When asked if it was chilly all day, Carolyn responded, "Not really. I mean, for that day it had seemed like it had gotten warmer, but it was, you know, probably fifties, I'd say. * * * It could have been forties." Carolyn stated that when she left the gym, it "could have been" below freezing. She testified that she remembered "it being chilly because I was in my workout gear and I didn't have a jacket or anything. I remember saying to my son, I should have probably brought a jacket." Carolyn testified, "I do remember that it was warmer during the day because I didn't have a jacket with me, then later that evening I was wishing I had had that jacket."

{¶ 53} Carolyn stated that she and her son went directly to Wyler from the gym. She stated that she and Evans arrived at the same time, and that she followed him around to the service entrance. Carolyn testified that she observed Evans exit his cruiser and walk to the key deposit box. She stated that as Evans approached the box, her son got out of the front passenger seat of her vehicle and got into the backseat. The following exchange occurred:

Q. What did you see?

A. Well, he had put the key in the drop box and he had turned around and he was walking straight toward the car. * * *

Q. Okay.

A. So he was coming straight for the car, and then all of a sudden it just all became a blur and I seen two feet going up in the air and his body falling to the ground.

{¶ 54} Carolyn stated that before Evans fell, she did not notice any ice on the

ground. She testified that she and her son got out of the car and ran to Evans, and that in doing so she did not notice any ice on the ground. When asked if she observed any ice when she reached Evans, Carolyn responded, "It's not that I observed it. I felt it, like it was very slippery around where he was laying, and I observed him laying there * * * all crumpled up." Carolyn stated that she and her son did not slip on the ice. Carolyn stated that she ran inside the dealership to get help, and that approximately five people came out to the parking lot, including the manager. When asked if she observed how large the patch of ice was where her husband fell, Carolyn responded, "No, but I do recall that as we were there working on my husband, I kept saying to people, please be careful. I don't want you to fall and be injured like this as well."

{¶ 55} Carolyn stated that the manager took her inside the dealership to exchange identifying information. She stated that the manager offered to help bring Evans inside "because at that time my husband was shaking really, really bad and they thought maybe he was cold and they said they wanted to get him off the ice * * * but he refused that." Carolyn stated that as the manager walked her to his office, "he just said, you know, we were just saying that we needed to resalt this area * * *."

{¶ 56} Carolyn identified a color photograph of Evans on the ground after he fell that was taken by her son, and she testified that there are visible scrape marks in the ice to the left of Evans' body "where his foot scraped it." She stated that the area above Evans' head appears to be shiny in the photograph due to the presence of ice. In response to a question from counsel for Evans regarding the manager's remark about salting the area, Carolyn testified, "I don't know if he said resalt or salt it again, but it was obvious that they needed to - - the way that he said it, it was obvious that they had salted

it in the morning and that they needed to resalt it again. That was my impression when I was talking to him."

**{¶ 57}** Kaleb Evans testified at deposition that he and his mother went to Wyler to pick up Evans after working out at the gym on November 17, 2014. When asked about the weather that day, Kaleb responded that it "was cold in the morning and then I do recall it warming up a little bit throughout the day and then toward the end of the day it started getting cold again" when they picked up Evans. Kaleb stated that it was "chilly" when he left the gym. Kaleb stated that he did not observe his father encounter any ice on his way to the drop box. He testified that he watched as his father approached their vehicle from the backseat, and that Evans' "foot slipped and he went up into the air and that's when I saw him falling, and that's immediately when I started to react and struggled to get out of the door because it was locked." Kaleb stated that Evans "was yelling in pain," and that when he reached him it was clear that he had broken his arm.

**{¶ 58}** Kaleb stated that he did not observe any ice or shiny areas on the blacktop before his father fell, and that he did not have any trouble reaching his father due to ice. According to Kaleb, he noticed ice when he reached his father. Kaleb stated that he noticed "that [Evans] was laying on the ice and his - - I didn't want his head on the icy part of the asphalt, and I mean, I was wearing athletic shorts, so my knees were obviously on the asphalt, and it was cold * * *." Kaleb identified the photograph he took of his father 10-15 minutes after he fell. Kaleb stated that, facing the service entrance at Wyler, his father fell "just right of the drainage pipe."

**{¶ 59}** Austin Castle testified that at the time of Evans' fall, he was a sales manager at Wyler. When asked, "what stands out in your mind about what happened that day,"

Castle responded, "Just a very cold day and apparent - - I guess apparent injury to Mr. Evans." When asked if he remembered "that it had snowed recently before this incident," Castle responded affirmatively. He stated that on the day of Evans' fall, "it was very cold." Castle stated that Wyler has "in-house" snow removal, and that "we have multiple plow trucks and salt trucks, so multiple people use those as well, and then we have all the lot techs do salt." Castle stated that Ron Christman, the "[a]ftermarket slash/ lot tech manager" directs any necessary snow removal. Castle stated that he does not know what time Ron Christman left Wyler the day of Evans' fall.

{¶ 60} Castle stated that when Evans fell, he was in his office and "one of our lot attendants came and got me." Castle stated that he "went outside to Mr. Evans and saw that, yeah, his arm was broke, and my attention was on him, and I think we asked to get him a blanket and something to rest his head on and made sure that the ambulance and police were notified." He stated that when the ambulance arrived, he did not observe the ambulance personnel experience difficulty because of the ice. He stated that he invited Carolyn inside the dealership to get her contact information.

{¶ 61} The following exchange occurred:

Q. Do you recall telling her that you guys knew and you had just talked that evening about putting more salt outside?

A. I do not recall that.

Q. Is that something that may or may not have happened, you just don't recall one way or the other?

A. I don't recall.

* * *

Q. Did you overhear the lot techs saying anything about they knew that there was ice out there?

A. Again, I don't recall that.

* * *

Q. Now, you mentioned that you know and you remember that it was a very, very cold day that day.

A. Uh hum.

Q. Do you recall having Ron Christman or any of the lot techs do any snow or ice attention to the facility at Wyler that day?

A. Basically, I don't recall a hundred percent. I know they do it very often in the wintertimes, so - -

Q. Did you have to call anyone's attention to deal with snow or ice that day?

A. No, not that I'm aware of.

* * *

Q. And I think we started out by saying that you do recall that it snowed to some extent either that morning or the day before, but recently?

A. Yeah, give or take, yeah.

**{¶ 62}** Castle stated that in the ten years he has been employed at Wyler, he is unaware of any other customer slipping on ice on the parking lot and sustaining injury.

**{¶ 63}** Construing the evidence most favorably in favor of Evans, we begin our analysis with the threshold question of whether a genuine issue of material fact exists regarding the nature of the accumulation of ice upon which Evans slipped and fell. If the

accumulation occurred naturally and was not the result of an intervening act by Wyler aggravating its hazardous presence, then Wyler had no duty to remove the ice or render it less dangerous. We will first consider *Rayburn* and *Tyrrell*, upon which Evans relies. In *Rayburn,* William Rayburn sued the city of Columbus after he slipped and fell on an icy street behind his residence, and his wife also brought a derivative claim for loss of consortium. *Id.*, *1. The trial court granted summary judgment in favor of the city, on the basis of immunity, and summarily stated "that the ice upon which appellant fell was a 'natural accumulation of water,' alluding to the general rule that no liability exists under such circumstances." *Id.* On appeal, the Rayburns argued that William's fall "was caused not by a natural accumulation of ice or snow, but by a persistent sewer drainage problem of which the city had long been aware and for which it was responsible to maintain." *Id.*, *2.

{¶ 64} The record before the Tenth District established the following facts:

According to the deposition testimony of four neighbors familiar with the condition of the alley, a sewer drainage problem existed there for several years before Mr. Rayburn's accident. Essentially, the witnesses testified that the drainage problem caused depressions or "sink holes" into which standing water would accumulate and often turn into ice. Due to the composition of the alley's surface, the ice could become "black ice," making it virtually impossible to see. According to an affidavit executed by Mr. Rayburn, black ice was the direct cause of his fall. Several of the neighbors testified that they called the city to complain about the persistent problem.

The city performed some repair work at the site, "tarring and

chipping" a portion of the area, but did not eliminate the underlying drainage problem. Linda Rayburn submitted an affidavit in which she attested to the complaints she had made to the city on several occasions prior to her husband's accident. Deposition testimony of several residents, in addition to the city's related telephone complaint logs and work orders for the subject area, demonstrate several complaints lodged with the city regarding this problem prior to Mr. Rayburn's accident.

The city essentially summarizes the facts it deems relevant for summary judgment as follows: Mr. Rayburn slipped on a patch of ice which he should have known was there.

*Id.*

**{¶ 65}** After concluding that "the trial court erred in granting summary judgment for the city on the immunity issue," the Tenth District further found that "the record is sufficient to create a factual issue as to whether the long-standing sewage problem created a known nuisance." *Id.*, *4. Finally, the Tenth District determined as follows:

We also find error in the trial court's apparent conclusion, which substantively amounts to a single-sentence aside in the court's decision, that no liability exists because the ice upon which appellant fell " * * * was a natural accumulation of water * * *." To the contrary, the record contains evidence, again construed in favor of appellants, suggesting that while the ice itself may have directly resulted from inclement weather, the *accumulation* of the ice may well have been caused by unnatural forces, such as an intervening act or omission that perpetuates or aggravates the

preexisting presence of the ice. * * *

*Id.*, *5.

{¶ 66}  In *Tyrrell*, a business invitee sought damages from a drug store-tenant and the building owner after a slip and fall on ice while leaving the drug store. *Id.*, at 47.   At the close of the evidence, the court directed a verdict dismissing the drug store, and the jury found the business invitee and building owner equally at fault. *Id.*   The Eighth District remanded the matter "for a retrial of the case against the drug store." *Id.*, at 48. The court noted that on the date of the fall, "plaintiff drove to the defendant drug store to purchase lottery tickets on January 31, 1981 at approximately 6:30 p.m."  *Id.*, at 48.   The court noted the following additional facts:

> * * * [Plaintiff] parked across the street from the one-story brick building that housed a row of businesses, including the drug store. He crossed the street and walked toward the drug store on the eighteen-foot wide public sidewalk in front of the building. To shield himself from the cold wind, he travelled close to the building.
>
> It was dark then, but street lights and lights inside the store illuminated the area in front of the drug store. Side-by-side glass doors provided the entrance and exit for the drug store's customers. Plaintiff entered the store through the entrance door without incident and made his purchase.
>
> Plaintiff left the store through the exit door. It opened outward onto the public sidewalk. A few steps outside the doorway while trying to pass around the open door, plaintiff fell forward injuring his face, shoulder and

knee.

Plaintiff testified that after he fell, he noticed a transparent patch of ice on the sidewalk approximately one and one-half to two feet in diameter. Except for this patch, the sidewalk was dry and clear. Although plaintiff had walked past the ice on his way into the store, he did not notice it at that time.

After his fall, plaintiff reentered the drug store, where the store's pharmacist assisted him. The pharmacist told plaintiff that the store occasionally had problems with melting snow and rain dripping onto that area from the building's canopy. This permanent canopy attached to the building's front wall and extended five feet over the sidewalk from that wall for the building's entire length.

Nine days later, plaintiff returned to the drug store with his attorney. He then noticed that the canopy's underside was damaged and discolored directly above the sidewalk area where he saw the ice patch after he fell. Photographs of the canopy's condition at that later visit were admitted as evidence.

Plaintiff argued that a defect in the flat canopy allowed melting snow and water to drip from the far edge of the canopy onto the sidewalk. When the temperature dropped, the accumulated water produced a hazardous icy patch on an otherwise dry sidewalk.

The pharmacist testified that he was working at the store on the evening that plaintiff fell. When the plaintiff reported his fall, the pharmacist saw the icy patch under the canopy edge and put rock salt on it. He had

been aware for several years that water occasionally dripped from the edge of the canopy and formed ice in front of his store. However, that condition was not unique to his storefront area.

During the winter months, the pharmacist or his employees regularly shovelled [sic] and salted the sidewalk in front of the drug store. He testified that the sidewalk in front of the store was generally dry and clear. He was not aware of any ice there on the evening plaintiff fell, until plaintiff reported his fall.

Plaintiff called a roofer as an expert witness about defects in the building's canopy. The roofer said the canopy's design and construction accumulated moisture and failed to divert it properly, so it dripped onto the sidewalk. He said that the canopy condition observed nine days after plaintiff's fall had existed before the fall and demonstrated the described defect.

*Id.*

**{¶ 67}** Based upon the distinctions between this matter and the above authorities, we conclude that Evans' reliance on *Rayburn* and *Tyrrell* is misplaced. In *Rayburn*, a genuine issue of fact existed as to whether the accumulation of the ice therein was caused by unnatural forces, namely the city's intervening act or omission in addressing the persistent drainage problem, of which it was long aware and responsible to address. In *Tyrrell*, the pharmacist was aware for several years that ice formed in front of the store after water dripped from the canopy, and an expert testified that the canopy's defective design and construction failed to properly divert the accumulated moisture, thereby

causing it to drip onto the sidewalk. In contrast, Evans did not identify any circumstances creating a hazard substantially more dangerous to him than that normally associated with snow and ice in the winter. Evans testified that it had snowed the day before he fell, that it was warmer during the day of his fall, and that the temperature fell into the 30s on the evening of November 17, 2014. Carolyn and Kaleb also testified that it was cold that evening. No evidence was offered that Wyler contributed to an unnatural accumulation of ice by creating a flow of water apart from normal drainage. Further, while he asserts in his brief that he did not observe ice on the ground elsewhere that day, as in *Corson*, other surrounding areas may have been in a different or better condition for any number of reasons.

{¶ 68} The mere existence of a depressed area around the drain is insufficient to establish a duty on behalf of Wyler to remove or warn of the ice there, with no evidence that the ice was man-made or caused by Wyler due to "an improperly placed drainage system and/or inadequately maintained cement surface," as Evans alleged existed in his complaint.[2] There was no evidence that the drain was defective or clogged, and Evans failed to identify any intervening act by Wyler that aggravated the natural phenomenon of the buildup of ice. In other words, while in *Rayburn* and *Tyrell*, there was evidence that defective conditions caused the accumulation of ice, Evans presented no evidence, but only speculative allegations, of a defective drainage system. The singular statement attributed to Castle about salting or resalting the area is insufficient to establish superior knowledge of a hazard by Wyler. In other words, even if Wyler possessed a general

---

[2] We note that the photographic exhibits to the depositions depict an area of asphalt around the large drain where the fall occurred, and not a cement surface.

awareness of a need to salt or resalt the area, such knowledge is insufficient to impute actual or constructive knowledge of the specific condition that Evans alleged existed near the large grate, and summary judgment was accordingly properly granted.

**{¶ 69}** For the foregoing reasons, we conclude that Evans failed to meet his burden to demonstrate specific facts showing that there is a genuine issue for trial. Accordingly, Evans' second assignment of error is overruled.   The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Jonathan Phillip
Kenneth Ignozzi
Hon. Douglas M. Rastatter